**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**NELSON RIVERA,
D.O.C. # X73975,**

     **Plaintiff,**

**vs.**                                                    **Case No. 4:20cv532-WS-MAF**

**JENNIFER KYER, RN,
EDWARD HAND, HA,
VALERI HOUCK, PA, and
ALEXIS ACOSTA-MARTINEZ, MD,**

     **Defendants.**
_____/

**SECOND REPORT AND RECOMMENDATION**[1]

Plaintiff, an inmate proceeding pro se and with in forma pauperis

status, filed a civil rights complaint under 42 U.S.C. § 1983, ECF No. 1.

Plaintiff challenges the medical care he received after fracturing his ankle

while incarcerated at Wakulla Correctional Institution Annex.[2]  *Id.* at 6.

---

[1] The first Report and Recommendation, ECF No. 24, entered in this case addressed Defendants' motion to dismiss, ECF No. 18, and rejected the argument that Plaintiff failed to exhaust administrative remedies.  The recommendation was adopted without objection.  ECF No. 25.

[2] Plaintiff has subsequently been released from the Department of Corrections and provided his address upon release within his reply.  *See* ECF No. 46.

Defendants are Jennifer Kyer, a registered nurse, Edward Hand, a health

service administrator, Valeri Houck, a physician's assistant, and Alexis

Acosta-Martinez, a medical doctor.  ECF No. 27 at 2.  All Defendants

worked at Wakulla Correctional Institution, located in Crawfordville, Florida.

*Id.*  Defendants filed an answer, *id.*, to the complaint and the parties were

permitted to conduct discovery.  ECF No. 28.  At the end of the discovery

period, Defendants filed a motion for summary judgment, ECF No. 37, as

did Plaintiff, ECF No. 39.  The parties were advised of their burdens in

opposing summary judgment, ECF Nos. 38 and 40, and timely filed

responses.  ECF Nos. 42 and 44.[3]  The parties also filed replies to the

opposing party's response.  ECF Nos. 46-47.  The motions are ready for a

ruling.

**Legal standards governing motions for summary judgment**

 "The court shall grant summary judgment if the movant shows that

there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Thus,

summary judgment is proper "after adequate time for discovery and upon

---

 [3] Plaintiff's response, ECF No. 44, was incorrectly titled as a "reply."  It was timely provided to prison officials to mail for him on June 9, 2022, but remarkably, it was not received in this Court until July 1, 2022.

motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp., 477 U.S. at 323, 106 S. Ct. at 2553.  The non-moving party must then show[4] the court "that there is an absence of evidence to support the nonmoving party's case."  Id. at 325, 106 S. Ct. at 2554.

An issue of fact is "material" if it could affect the outcome of the case. Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th

---

[4] "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), cert. denied 522 U.S. 1126 (1998) (quoting Celotex, 477 U.S. at 324, 106 S. Ct. at 2553) (quoting Fed. R. Civ. P. 56(c), (e))).  The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c).  Owen, 117 F.3d at 1236; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.

Cir. 2004) (citations omitted).  A party must show more than the existence of a "metaphysical doubt" regarding the material facts, <u>Matsushita Elec. Indus. Co., LTD. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence is insufficient.  The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  <u>Hickson Corp.</u>, 357 F.3d at 1260 (quoting <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986)).

"Summary judgment is not a time for fact-finding; that task is reserved for trial."  <u>Sconiers v. Lockhart</u>, 946 F.3d 1256, 1263 (11th Cir. 2020) (citing <u>Tolan v. Cotton</u>, 572 U.S. 650, 655-57, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014)).  Specific facts pled in a sworn complaint and supported by record evidence must be credited to the Plaintiff, and all reasonable inferences must be resolved in the light most favorable to the nonmoving party. <u>Sconiers</u>, 946 F.3d at 1262-63.  However, "when competing narratives emerge on key events, courts are not at liberty to pick which side they think is more credible."  946 F.3d at 1263.  On the other hand, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the

nonmoving party, there is no genuine issue for trial."  Matsushita Elec.

Indus. Co., 475 U.S. at 587 (internal quotation marks omitted) (quoted in

Ricci v. DeStefano, 557 U.S. 557, 586, 129 S. Ct. 2658, 2677, 174 L. Ed.

2d 490 (2009)).  "[A]t the summary judgment stage the judge's function is

not himself to weigh the evidence and determine the truth of the matter but

to determine whether there is a genuine issue for trial."  Anderson, 477

U.S. at 249, 106 S. Ct. at 2511 (quoted in Sears v. Roberts, 922 F.3d 1199,

1205 (11th Cir. 2019)).

"Cross motions for summary judgment do not change the standard."

Latin Am. Music Co. v. Archdiocese of San Juan of the Roman Catholic &

Apostolic Church, 499 F.3d 32, 38 (1st Cir. 2007) (quoted in Ernie Haire

Ford, Inc. v. Universal Underwriters Ins. Co., 541 F. Supp. 2d 1295, 1297

(M.D. Fla. 2008).  "'Cross motions for summary judgment are to be treated

separately; the denial of one does not require the grant of another.'"

Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n, 483 F.3d

1025, 1030 (10th Cir. 2007) (quoting Buell Cabinet Co. v. Sudduth, 608

F.2d 431, 433 (10th Cir. 1979)) (quoted in Ernie Haire Ford, 541 F. Supp.

2d at 1297-98)).  Thus, each motion for summary judgment has been

separately evaluated.

**Relevant Rule 56 Evidence**

**1.  Plaintiff's Evidence**

On December 28, 2018, Plaintiff woke up with "excruciating pain in [his] lower back and numbness in [his] right leg."  ECF No. 1 at 6.[5]  He submitted a sick call request, and 10 days later submitted a second request for medical attention.  *Id.*  Plaintiff was eventually seen by the sick call nurse on January 9, 2019, who gave him Ibuprofen and sent him back to his dorm.  *Id.*  On January 16, 2019, Plaintiff was again seen in sick call because of the second request he submitted.  *Id.*  A nurse evaluated him and diagnosed Plaintiff with a pinched nerve.  *Id.*  He was again provided Ibuprofen and told to submit another sick call request if the pain persisted.  *Id.*  Two days later, Plaintiff submitted a third sick call request, but "was denied access to sick call a week later."  *Id.*

On January 22, 2019, Plaintiff "declared a medical emergency" because of the "agonizing pain and discomfort."  ECF No. 1 at 6.  He was taken to medical and x-rays of his back were taken.  *Id.*  Defendant Acosta

---

[5] Plaintiff's complaint was signed under penalty of perjury and, thus, the facts alleged therein constitute evidence which is properly considered in ruling on summary judgment motions.  Sears v. Roberts, 922 F.3d 1199, 1206 (11th Cir. 2019); Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1098 (11th Cir. 2014).

gave Plaintiff two injections for pain, a prescription for Naproxen, 500 mgs.

of "pain relievers," and was told he would have a follow-up appointment in

a week.  *Id.*  When Plaintiff did not receive a follow-up visit as he had been

"assured" by Defendant Acosta, he declared another medical emergency.

*Id.*  Even though the on-duty nurse submitted a referral for Plaintiff to "see

the doctor immediately," Plaintiff said it "took a whole week."  *Id.*

Plaintiff was seen by Defendant Houck on February 15, 2019, and

told "it was only arthritis," not a pinched nerve as previously diagnosed by a

different nurse.  ECF No. 1 at 7.  Plaintiff was given 15 mgs. of Meloxicam,

but said he continued to experience pain, discomfort, and numbness that

traveled down his "entire left side."  *Id.*  Plaintiff said the medications

provided "little or no relief at all."  *Id.*

Plaintiff said that because of his ongoing back problems and

numbness, he fell on March 4, 2019, and fractured his ankle.  ECF No. 1 at

7.  Plaintiff was taken to medical, but Defendant Kyer refused to treat him

and said Plaintiff was "faking an injury."  *Id.*  The notation in Plaintiff's

health care record states that Plaintiff was "refusing to remove" his own

shoes and socks and also was "refusing to attempt to ambulate."  ECF No.

39 at 6.  Defendant Kyer put Plaintiff "in a wheelchair and sent [him] back

to the dorm." ECF No. 1 at 8. It appears Plaintiff was given a "24 hour" wheelchair pass and was scheduled to see a "provider" on the following day. ECF No. 39 at 6.

Plaintiff also submitted a copy of an "non-traumatic joint/extremity pain protocol" form. ECF No. 39 at 7. The form is dated March 4, 2019, and indicates Plaintiff was seen in the emergency department ["EMID"]. *Id.* Plaintiff reported that after he took his shower, his "right leg gave out." *Id.* He said the pain was worse in his "back and right calf." *Id.* He complained that his right leg felt "numb," but a notation on the record indicates Plaintiff was "observed bearing weight on right foot." *Id.* Plaintiff did not specify his level of pain, and indicated it occurred gradually approximately two months prior. *Id.* No swelling was noted and Plaintiff reported no trauma. *Id.*

The record also states that Plaintiff had seen a clinician for the "same pain/swelling." ECF No. 39 at 7. He said he could walk "a little," and was able to bend and straighten the joint. *Id.* Defendant Kyer noted Plaintiff's skin tone was "normal" and no change in pain level with mild palpation. *Id.*

The health care record indicates Plaintiff was seen by Defendant Houck on March 5, 2019. ECF No. 39 at 6. She noted that Plaintiff had "work restrictions," a low bunk pass, a prescription for pain, and "was

counseled on lifestyle modifications & ds management." *Id.*  It appears

Defendant Houck authorized a wheelchair pass and a wheelchair.  *Id.*  She

also noted Plaintiff needed a "P-T eval" [presumably, a physical therapy

evaluation] and Plaintiff was to sign a "consult request."  *Id.*

On March 13, 2019, Plaintiff again reported to sick call "with no

satisfaction."  ECF No. 1 at 7.  Plaintiff said that it was not until March 22,

2019, "18 days after the injury," that Plaintiff was given x-rays.  *Id.*

The evidence provided with Plaintiff's summary judgment motion,

ECF No. 39, reveals Plaintiff's x-rays were taken on March 22, 2019.  The

result showed an "oblique fracture with lateral offset distal fibula" of the

right ankle.  *Id.* at 9.  There was "[d]isruption of the ankle mortise with

lateral subluxation."  *Id.*  "No definitive tibia fracture."  *Id.*  An x-ray of

Plaintiff's right knee indicated the knee join was "in alignment, but there

[was] narrowing of the joint space due to mild degenerative changes."  *Id.*

There was also "mild degenerative spurring involving tibial spine and

femoral condyles."  *Id.*  "No fracture of dislocation" was seen, nor any "joint

effusion."  *Id.*  The conclusion was "mild osteoarthritis of the right knee."  *Id.*

Plaintiff contends that he was "scheduled for emergency surgery" on

March 29, 2019, but that was "canceled at the last minute."  ECF No. 1 at

7.  Plaintiff had follow-up x-rays on April 1, 2019, that were compared with the March 22nd x-rays.  ECF No. 39 at 10.  The radiology report stated: "Obligue comminuted non acute fracture at the distal fibula with mild lateral displacement, status post closed reduction."  *Id.*  "The talus is subluxed lateral will widen ankle mortise at its lateral aspect, unchanged."  *Id.*  The conclusion was: "Unchanged fracture subluxation at the right ankle."  *Id.* As for Plaintiff's knee, the second x-ray showed no "acute fracture or dislocation."  *Id.*  There was "mild DJD [mild degenerative joint disease] of the right knee."  *Id.*

In addition, Plaintiff was also given an x-ray of his chest.  ECF No. 39 at 10.  The results showed both lungs were clear, and Plaintiff's "aorta and heart [were] within normal limits."  *Id.*  There was "[n]o acute pulmonary finding."  *Id.*

A follow-up x-ray of Plaintiff's right ankle on May 28, 2019, again showed there was a "fracture involving right distal fibula with modest displacement and early callus formation since 3/22/2019, with widened and angulated ankle mortise."  ECF No. 39 at 11.  The x-ray also indicated there was "associated soft tissue swelling."  *Id.*

Another x-ray taken on August 16, 2019, showed "no acute fracture." ECF No. 39 at 12. "The osseous structures appear stable." *Id.* "Joint spaces are altered." *Id.* "Soft tissues are unremarkable." *Id.* The conclusion was "[n]o acute osseous abnormality," but there were "[d]egenerative changes." *Id.* The interpreting physician, Dr. Kuehn, found it was a "[s]table fibula fracture and disrupted ankle mortise compatible with ligamentous injury." *Id.*

Another x-ray was taken two months later on October 9, 2019, and compared with the August x-ray. ECF No. 39 at 13. The results showed "osteopenia" and an "old fracture of the distal shaft of the fibula which" appeared to have healed. *Id.* "No acute fracture" was seen. *Id.* Again, the reviewing physician found there was "disruption of the ankle mortise which was also present on the study of 8/16/2019." *Id.* A notation indicated there had "been interval removal of the cast when compared to the prior study." *Id.* The conclusion was "[n]o acute osseous abnormality" of the "[o]ld fibular fracture," and again found "[d]isrupted ankle mortise compatible with ligamentous injury." *Id.*

It appears Plaintiff had surgery on October 11, 2019. ECF No. 39 at 14. The "preop diagnosis" was "[m]alunion of right ankle fracture

dislocation." *Id.* The Operative Report indicates that Plaintiff "sustained a fracture dislocation of his ankle seven months" earlier. *Id.* However, his surgical procedure was delayed due "to severe cervical radiculopathy" and Plaintiff underwent "a decompression laminectomy incision of the cervical spine." *Id.* The Report indicates an "Osteotome was used to re-break the fracture" and mobilize the distal fibula. *Id.* Syndesmosis screws were used with a "small fragment locking plate" on the "lateral cortex of the fibula and the lateral malleolus." *Id.*; *see also* ECF No. 39 at 16.

A post surgical x-ray taken on October 14, 2020, indicates the presence of "a right distal fibular internal fixation hardware" and a "minimally displaced trans-syndesmotic screw fracture." ECF No. 39 at 16-17. Joint space was preserved and the alignment was "unremarkable." *Id.* at 17. The conclusion was "internally fixed right distal fibular fracture deformity with a minimally displaced transit his buttock screw fracture." *Id.*

Cervical spine x-rays were also taken. ECF No. 39 at 17. The result was "C5 corpectomy with C4-C6 cervical spine instrumentation with screws" present. *Id.* There was no evidence of "hardware failure or perihardware lucencies," but "mild multilevel degenerative disc disease and uncovertebral/facet arthropathy" was seen. *Id.* The conclusion was "C4-

C6 ACDF with C5 corpectomy with radiographic adverse features." *Id.* A notation states that if "clinical concern" persisted, "consider CT/MR cerfical spine for further assessment." *Id.*

Another post-surgical x-ray of the ankle was taken a week later on October 21, 2020, and showed "[p]ostsurgical change." ECF No. 39 at 18. The radiology report notes that one of the screws had fractured and another had "lucency around its distal aspect." *Id.* There was "also widening of the ankle mortise joint" and the lateral view showed "osteoarthritic change at the ankle joint." *Id.* The summary was that the x-ray showed "evidence of ankle joint instability" and soft tissue swelling. *Id.* The report was stamped with "Alert" and reviewed by APRN B. Allen. *Id.*

Three months later another x-ray was taken (January 8, 2021). ECF No. 39 at 19. It showed "the superior anchoring screw [was] broken." *Id.* The alignment was found to be "unchanged since the previous exam." *Id.*; *see also* ECF No. 39 at 20. A note in Plaintiff's health care record by his surgeon on January 29, 2021, states: "painful hardware right ankle." *Id.* at 21. It appears that surgeon removed the plate and screws from Plaintiff's right ankle. ECF No. 39 at 23. The screws which were "placed in the

medial malleolus" were not causing problems and it appears they were not removed.  *Id.*

Plaintiff has complained that his ankle "was improperly repaired." ECF No. 1 at 7.  He says that he is "still experiencing excruciating pain and swelling in the right ankle."  *Id.* at 8.

As for Defendant Hand, the Health Services Administrator, Plaintiff broadly claimed that he was advised of his medical condition from Plaintiff's family, but "deliberately refused to intervene to see that [Plaintiff] was given the proper medical treatment and attention."  *Id.* at 8.  Plaintiff provided no dates or times as to any of the communications.

In addition to Plaintiff's allegation that Defendant Houck told him that he only had arthritis, Plaintiff said Defendant Houck "deliberately" delayed his x-rays which caused Plaintiff excessive pain and suffering.  *Id.*  Plaintiff said Defendant Acosta demonstrated "a reckless disregard" for his injured ankle by failing "to conduct a follow-up appointment."  *Id.*

### 2.  Defendants' evidence

On December 28, 2018, Plaintiff submitted a sick-call request in which he complained that his "low back" was hurting him "real bad" and his right leg was numb from his hip to his foot.  Ex. A (medical records) at 1

[hereinafter ECF No. 37-1 at 1]. Plaintiff said the problem started three days ago. *Id.* The request was submitted at 4:00 a.m. on Defendant 28, 2018, but a stamp on the request form indicates it was not "received" until January 7, 2019. *Id.* The request was marked "routine" and Plaintiff was to be "triaged" on January 8th. *Id.*

The medical record indicates Plaintiff was not seen in sick call until the morning of January 9, 2019. ECF No. 37-1 at 2. It appears Plaintiff was examined by LPN M. Greene. *Id.* Plaintiff complained of low back pain and denied having a history of back problems. *Id.* He said the pain started three weeks earlier and "just happens." *Id.* He described the pain as "aching," and indicated it radiated through the buttock and down his right leg. *Id.* Plaintiff said he also had intermittent numbness. *Id.*

The nurse noted that Plaintiff was walking bent over. *Id.* Plaintiff was given 200 mg. Ibuprofen, and prescribed an OTC (over the counter) topical analgesic. *Id.* at 3. The chart was referred to a clinician for "possible muscle relax med. Rx med." *Id.* at 3-4. Later that same day, Defendant Houck reviewed Plaintiff's chart and prescribed him 400 mg. Ibuprofen. *Id.* at 4-5; *see also* Ex. B (Houck declaration) at 2 [ECF No. 37-2 at 2].

Nearly two weeks later, on January 22, 2019, Plaintiff declared a medical emergency ("DME") due to low back pain and right leg numbness. ECF No. 37-1 at 6.  Plaintiff was evaluated by Defendant Acosta-Martinez, the physician at Wakulla C.I.  *Id.*; *see also* Ex. C (Acosta-Martinez declaration) at 1-2 [ECF No. 37-3 at 1-2].  Plaintiff said he had been struggling with the pain for a month but it had gotten worse the day before." ECF No. 37-1 at 6.  He also said he had been taking Ibuprofen "with no significant" relief.  *Id.*

Plaintiff was noted to have a mild limp on his right leg, and "limited range of motion of the back for anterior and lateral flexion (meaning bending forwards, backwards and sideways)."  ECF No. 37-3 at 2.  "There was no spinal tenderness."  *Id.*  "The flexion, extension, and abduction (meaning movement of the leg away from the midline of the body) in Mr. Rivera's right leg was intact and his deep-tendon reflexes were normal." *Id.*  The strength in Plaintiff's "right leg was 4/5 and his left leg was 5/5."  *Id.* "No swelling was present."  *Id.; see also* ECF No. 37-1 at 6.

A back pain protocol form shows Plaintiff reported that his "leg gave away."  ECF No. 37-1.  He reported his pain level as a 10 on a scale of 1-10, and described it as a "squeezing pain."  *Id.*  He said the pain increased

when walking, and that he could not find a comfortable position. *Id.*

Plaintiff indicated he was experiencing back spasms, numbness, and pain

radiating down his leg. *Id.* The nurse who completed the form, LPN

Nelson, noted Plaintiff was limping and had mild swelling in the right lower

back. *Id.*

Defendant Acosta-Martinez diagnosed Plaintiff with low back pain,

and ordered an x-ray of Plaintiff' "lumbar spine and sacrum to rule out

muscle spasms." ECF No. 37-3 at 2. In addition, Plaintiff was given

"intramuscular injections of Torodol and Solumedrol" and prescribed 500

mg. Naproxen, a tube of analgesic balm, and Plaintiff was educated on

strengthening exercises. *Id.; see also* ECF No. 37-1 at 6. A notation in the

chart stated that Plaintiff was to have a follow up in one week. ECF No.

37-1 at 8.

An x-ray of the lumbar spine was taken that same day (January 22,

2019) and revealed a "disc space loss with degenerative endplate changes

and osteophyte formation." ECF No. 37-1 at 9. There was no "significant

compression fracture, osseous lesion, spondylollsthesis or spondylolysis."

*Id.* "Degenerative changes to the SI joints" was noted. *Id.* The conclusion

was degenerative disc disease (DDD) "with no acute bony abnormality."
*Id.*

Although Defendant Acosta-Martinez ordered a follow-up
appointment in one week, he explains that he is "not responsible for
scheduling follow-up or referral appointments."  ECF No. 37-3 at 2.  Those
appointments "are scheduled through the medical records department."  *Id.*
Physicians such as Defendant Acosta-Martinez will "notate in the chart that
a follow-up is needed, and a nurse gives the order to the medical records
department."  *Id.*  "The medical records department eventually schedules
the appointment."  *Id.*

Defendant Acosta-Martinez did not provide further treatment to
Plaintiff related to this case after the January 22, 2019, examination.  ECF
No. 37-3 at 3.  Defendant Acosta-Martinez also did not put in a request for
a consult because, in his medical judgment, he found no need to do so until
the "current treatment plan's effectiveness [could] be determined."  *Id.* at 2-
3.

Plaintiff declared a second "medical emergency" on February 8,
2019, and was seen in the emergency department by LPN Lyons.  ECF
No. 37-1 at 10.  Plaintiff complained of back pain over the past two months,

said it was "burning" and "numbing," and he reported his pain as a 9 on a

scale of 1-10.  *Id.*  He again reported muscle spasms, and said he had

numbness or tingling in both hands and feet.  *Id.*  He further reported the

pain as constant rather than as intermittent.  *Id.*  Nurse Lyons' notes on the

back pain protocol form indicate Plaintiff's gait was "normal," and no

swelling or bruising was observed.  ECF No. 37-1 at 10.  Nurse Lyons

indicated Plaintiff should be scheduled for a follow up "from imaging" and

Plaintiff was given a "lay in" pass for February 8-10, 2019.  *Id.* at 11.  Nurse

Lyons did not find that Plaintiff's condition required immediate clinician

notification.  *Id.*

A week later, on February 15, 2019, Plaintiff was examined by

Defendant Houck as a follow up appointment for his continued complaints

of radiating back pain.  ECF No. 37-1 at 12.  Plaintiff reported that his right

leg occasionally buckled.  *Id.*  Defendant Houck noted Plaintiff had an

antalgic gait, meaning he "was avoiding bearing weight on his right leg."

*Id.*; *see also* ECF No. ECF No. 37-2 at 2.  Defendant Houck conducted a

"straight leg raise test ('SLR')" of Plaintiff's right leg, which was negative.

*Id.*; *see also* ECF No. 37-1 at 12.  During the evaluation, Defendant Houck

reviewed the results of Plaintiff's January 22, 2019, x-ray of his lumbar

spine and advised that he had "degenerative disc disease."  ECF No. 37-2 at 2.

Defendant Houck prescribed an anti-inflammatory (Mobic) for Plaintiff and "also submitted a consult request for physical therapy."  *Id.*  The consult request, dated February 15, 2019, noted that Plaintiff's back pain had not responded to Solumedrol, Toradol, or Naproxen.  ECF No. 37-1 at 14.  It appears the request was approved on February 20th.  *Id.*

Defendant Houck educated Plaintiff on "making lifestyle changes, such as losing weight and strengthening his core muscles."  ECF No. 37-2 at 2.  Defendant Houck declared that in her  "medical opinion, this is an appropriate course of treatment for degenerative disc disease."  *Id.*  She did not order further treatment because she "determined that further treatment was not warranted at that time."  *Id.*  She explained that "[t]he negative SLR indicated to [her] that Mr. Rivera was not suffering from any spinal cord issues."  *Id.*  If the SLR had been positive, Defendant Houck said she "would have ordered an MRI to rule out any neurological issues."  *Id.* at 2-3.  An additional consideration was that she could not recreate Plaintiff's "numbness or right-leg buckling, which indicated to [her] that more conservative course of treatment was appropriate."  *Id.* at 3.

Case No. 4:20cv532-WS-MAF

Defendant Houck continued Plaintiff's work restrictions and low bunk pass. ECF No. 37-1 at 12.

On March 4, 2019, Plaintiff was seen in the emergency department. ECF No. 37-1 at 16, 18.  He reported that after he took his shower, his "right leg gave out."  *Id.* at 16.  He said his leg felt numb, and the pain was worse in his back and right calf.  *Id.*  He denied recent trauma to the area. *Id.*  Plaintiff was seen by Defendant Kyer.  *Id.* at 16, 18.  She noted that Plaintiff was demanding a wheelchair, but he had not requested Ibuprofen. *Id.* at 17.  She also noted he already had an order for Mobic, which he had taken that morning.  *Id.* at 16-17.  Defendant Kyer also noted that Plaintiff had no swelling and "was observed bearing weight on right foot."  *Id.* at 16. She wrote in Plaintiff's medical record that Plaintiff was "refusing to remove his own socks" and was "refusing to attempt to ambulate."  *Id.* at 17-18. Defendant Kyer provided Plaintiff with a "24 hour" wheelchair to use in his dorm, and she directed Plaintiff to return in the morning to be seen by the clinician.  *Id.*

Defendant Kyer submitted a declaration in support of the summary judgment motion.  ECF No. 37-4.  She advises that she examined Plaintiff only on March 4, 2019.  *Id.* at 1.  She states that she conducted an

evaluation despite Plaintiff's "refusals to comply with [her] assessment." *Id.* at 2. Her declaration reiterates that Plaintiff had no swelling and she had observed him "walking to the appointment and bearing weight on his right foot." *Id.* She further points out that when she provided Plaintiff with the 24-hour wheelchair pass, she also confirmed with the officer in Plaintiff's dormitory that there was a "handicap accessible shower and toilet." *Id.* She instructed Plaintiff to "keep his leg elevated and to access sick call as needed." *Id.* Defendant Kyer explained that she did not "call the on-call doctor or" send Plaintiff to the hospital "because he did not present with a life-threatening injury." *Id.*

The following day, March 5th, Plaintiff's chart was reviewed by Defendant Houck. ECF No. 37-2 at 3. She states that she reviewed the "Joint/Extremity Pain Protocol form filled out by Nurse Kyer" the day before. Because Defendant Kyer did not observe any swelling, Defendant Houck did not order an x-ray "because there was no indication that an x-ray was necessary." *Id.* She did, however, issue Plaintiff a "temporary wheelchair pass." ECF No. 37-2 at 3. The medical record further indicates that Defendant Houck noted Plaintiff had work restrictions, a low bunk pass, and a prescription for pain. ECF No. 27-1 at 18. She also indicated he

needed "P-T eval" and noted that Plaintiff need to "sign consult request."
*Id.*

On March 10, 2019, Plaintiff submitted a sick-call request, ECF No.
37-1 at 19, complaining that his foot and ankle were swollen.  He said they
were "almost twice" their size and were "purple and black with bruising."  *Id.*
Plaintiff indicated that said he fell due to his "well documented back
problem."  *Id.*  Plaintiff complained that Defendant Kyer saw him on March
4th but said he "was faking."  *Id.*  Plaintiff further said he could not "put any
pressure on [his] foot" and asked to "be seen by someone that [was] a
medical professional."  *Id.*

Three days later Plaintiff was seen in sick call.  ECF No. 37-1 at 20.
At that time, Plaintiff said his foot, knee, and ankle were swollen.  *Id.*  The
sick-call nurse, J. Nealy, RN, observed "severe swelling," but noted "normal
skin tone."  *Id.*  The nurse gave Plaintiff 650 mg., Acetaminophen, and
directed him to elevate the limb.  *Id.* at 21.  A notation in the chart was
made to refer Plaintiff "to provider for evaluation & possible x-ray."  *Id.*

Defendant Houck reviewed Plaintiff's chart later that same day,
March 13, 2019.  ECF No. 37-2 at 3.  She states that she "signed off on an
order for an x-ray of" Plaintiff's right ankle.  *Id.*  Defendant Houck also

states that she is "not responsible for scheduling x-rays."  ECF No. 37-2 at

3.  Instead, x-rays are scheduled through the medical records department.

*Id.*  Further, "Wakulla Correctional Institution uses a mobile x-ray service

provider that is not present at the prison every day."  *Id.* at 3-4.  As such,

scheduling "must coincide with the times in which the x-ray provider will be

at the prison." *Id.* at 4.

Plaintiff's right knee and ankle were x-rayed on March 22, 2019.  ECF

No. 37-1 at 22.  The result for Plaintiff's ankle showed an oblique fracture

with lateral offset distal fibula." *Id.*  The x-ray of the knee showed it was in

alignment but had "narrowing of the join space due to mild degenerative

changes." *Id.*  No fracture, dislocation, or joint effusion was seen. *Id.*  The

conclusion was mild osteoarthritis of the right knee.  *Id.*

The records indicate Defendant Houck saw Plaintiff on March 22nd

and went over a "wet read" of the x-ray. *Id.* at 23.  She noted Plaintiff had

been non-weight bearing in an oversized wheelchair since the fall. *Id.*  She

educated Plaintiff on the "nature of injury" and wrote in the record that

Plaintiff needed to be evaluated by a surgeon. *Id.*  Plaintiff signed a

consent form and was given a prescription for 650 mg., Tylenol. *Id.* at 23-

24.  The "clinician's order sheet" noted that Plaintiff was "to be strictly non

weight bearing on right leg." *Id.* at 24.  Plaintiff was given a splint and told to elevate the right leg and not to remove the splint.  *Id.* at 23.

The next day, March 23, 2019, Defendant Houck admitted Plaintiff to the infirmary.  ECF No. 37-1 at 25-26.  It was reiterated again that Plaintiff was to be strictly non weight bearing on the right leg, the leg was to be elevated and the splint was not to be removed.  *Id.* at 26.  Plaintiff was given 650 mg., Tylenol, and the attending clinician was listed as Defendant Acosta and A. Kirkland, ARNP.  *Id.* at 25-26.

Defendant Houck submitted an orthopedic surgery consult request on March 23, 2019.  *Id.* at 27.  Plaintiff signed the request on March 29, 2019.  *Id.*  It appears that Plaintiff was kept in the infirmary until discharged to the Regional Medical Center ("RMC") on March 28, 2019.  *Id.* at 29.

Defendant Houck did not treat Plaintiff for medical care related to this case after March 2019.  ECF No. 37-2 at 4.  She specifically denies treating Plaintiff's "cervical spine."  *Id.*

The day after Plaintiff was transferred to RMC, he was evaluated by Dr. T. Winters, an orthopedic surgeon.  ECF No. 37-1 at 28.  Following that March 29, 2019, evaluation, Dr. Winters recommended ORIF surgery "as soon as possible."  *Id.*

On April 1, 2019, a neurology request was submitted from medical staff at RMC.  ECF No. 37-1 at 30.  The request was designated "urgent." *Id.*  It was noted that Plaintiff had left side weakness, and said that while Plaintiff "was standing on his left leg he fell" to the right side, resulting in a right ankle fracture and dislocation.  *Id.*  Further, the request stated that before doing surgery to repair the ankle, Plaintiff need to have "clearance from neurology." *Id.*  A head CT scan was requested.  *Id.*

Plaintiff was evaluated by Dr. Carlos Gama, a neurologist, on April 4, 2019.  ECF No. 37-1 at 31.  It was noted that Plaintiff was there "for clearance for surgery for fracture/dislocation" of his right ankle.  *Id.*  His history of low back pain was noted and Plaintiff said he was able to walk, but was unsteady and had weakness which required him to rest periodically to avoid falling.  *Id.*  Dr. Gama noted that Plaintiff had fallen in March "while standing."  *Id.*  Dr. Gama found Plaintiff had progressive weakness in his left upper and lower extremities.  *Id.*  His recommendation was to cancel the ankle surgery until a "neuro work up" could be performed.  *Id.*  Dr. Gama ordered an MRI of Plaintiff's brain, cervical and thoracic and lumbar spine.  *Id.*

On April 5, 2019, another consultation request was made from staff at RMC. ECF No. 37-1 at 32. This request was designated "emergency," and noted that Plaintiff had left side weakness and was "unable to ambulate." *Id.* The request included an MRI on the brain, cervical, thoracic, and lumbar region. *Id.*

Plaintiff also had a consultation with ARNP Bradley-Goodman on April 8, 2019. ECF No. 37-1 at 15. Plaintiff reported his progressive weakness and said it had caused him to fall and fracture his ankle. *Id.* After examining Plaintiff, it was recommended to "hold PT until cleared by neuro M.D. to procede" with spine exercises. *Id.*

The MRI results shows Plaintiff had severe to critical spinal canal stenosis at the C5-6 level of his cervical spine, and a neurosurgery consult was recommended. ECF No. 37-1 at 33. There was also "advanced" degenerative disc disease noted at C4-5, C6-7 and "moderate" at C3-4. *Id.* The brain MRI showed no abnormality. *Id.* It was recommended that Plaintiff have an "emergent" neurosurgical consult for treatment of cord compression. *Id.*

Plaintiff was taken to Memorial Hospital in Jacksonville on July 22, 2019, and examined by neurosurgeon, Dr. Kenneth Hill. ECF No. 37-1 at

34-36.  Dr. Hill assessed Plaintiff with cervical disk disease, cervical

stenosis with myelopathy and myelomalacia."  *Id.* at 35.  Dr. Hill stated that

from neurosurgical standpoint, Plaintiff was "not cleared for fixation of his

right lower extremity" (ankle surgery).  *Id.*  It was recommended that

Plaintiff undergo a "C5 corpectomy with C4 to C6 plate and fusion with

diskectomy at C4/5 and C5/6."  *Id.*  Prior to that surgery, Dr. Hill said that

Plaintiff would "need a CT scan of the cervical spine."  *Id.*

Plaintiff had surgery on his cervical spine on August 6, 2019, at

Memorial Hospital.  *Id.* at 37.  The post-surgical notes indicated Plaintiff

had "great decompression both centrally and laterally."  *Id.*  There was also

a "large disk herniation" found "posterior to the vertebral body of C5."  *Id.*

 It took until September 25, 2019, for Dr. Hill to clear Plaintiff for ankle

surgery.  ECF No. 37-1 at 40.  Dr. Hill explained that Plaintiff's cervical

surgery would "take an extended amount of time" for healing, and Plaintiff

was directed to continue to wear the hard cervical collar.  *Id.*

Surgery was eventually performed on Plaintiff's right ankle on

October 11, 2019.  ECF No. 37-1 at 54.   The "operative report" noted that

surgery had been delayed because of Plaintiff's "severe cervical

radiculopathy" and he first underwent treatment for that issue.  *Id.*

Dr. James Ryan performed the ankle surgery at the RMC.  *Id.* at 54-55.

Plaintiff was provided pain medications, a low bunk, and referred for

physical therapy.  *Id.* at 56-57.

As was evident from Plaintiff's evidence, he experienced problems

following this surgery.  He had a "post-op complication" including an

infected surgical wound in late November 2019.  ECF No. 37-1 at 61.  On

December 6, 2019, Plaintiff complained that his "whole leg" was swollen.

*Id.* at 65.  Nevertheless, Plaintiff received post-operative evaluations,

x-rays, physical therapy, and a wheelchair, and experienced positive

healing.  *Id.* at 56–70.  By March 4, 2020, Plaintiff advised that his ankle

had healed and he had no problems ambulating.  *Id.* at 71–72.  He

returned the wheelchair and denied any complications.  *Id.*

On August 2, 2020, Plaintiff submitted a sick call request to medical

staff at Santa Rosa Correctional Institution.  ECF No. 37-1 at 73.  He

complained that over the past two weeks he experienced shoulder pain,

numbness in his fingertips, and said he could not sleep.  *Id.*  In September,

Plaintiff was provided Toradol injections, a prescription for Mobic, and

x-rays.  *Id.* at 74.  By September 28, 2020, he reported "significant

improvement" with his shoulder pain, but said he still had numbness in his

right fingertips.  *Id.* at 75.  He also submitted a sick call request that day for

right ankle swelling.  *Id.* at 77.  He said it has been "swollen for a week"

and was causing "steady pain."  *Id.*  Plaintiff said it felt like "one of the

screws [was] coming out."  *Id.*

On October 21, 2020, an x-ray showed that one of the ankle screws

was "fractured." *Id.* at 78.  Another screw had "lucency around its distal

aspect."  *Id.*  The summary was that the x-ray showed "evidence of ankle

joint instability."  *Id.*  Ultimately, Plaintiff underwent surgery to remove the

plate and screws from the right ankle on January 29, 2021.  *Id.* at 80.

Defendant Hand submitted a declaration which explains that he is a

"Health Service Administrator."  ECF No. 37-5 at 1.  In that capacity,

Defendant Hand "oversee[s] the operational and administrative function of

the healthcare services provided to inmates."  *Id.* at 1.  He also reviews and

responds to inmate grievances.  *Id.* at 2.  Defendant Hand is "not a

healthcare provider" and is "not involved in the direct provision of medical

services to inmates."  *Id.*  Defendant Hand does "not make any clinical

decisions about the treatment provided."  *Id.*

Defendant Hand reports that, "on occasion," he receives phone calls

from "inmate family members inquiring about treatment status or wishing to

procure some sort of treatment for a certain inmate." ECF No. 37-5 at 2.

He says that the "most" he can "do in response is to inform the clinical

provider about the family member's inquiry," but the provider is the one

who makes a decision on treatment. *Id.* Defendant Hand "cannot

intervene with a treatment plan or recommend treatment." *Id.*

Defendant Hand said that his "usual practice" is to "notate in an

inmates's medical chart that [he] spoke with the inmate's family regarding

the inmate's medical status." ECF No. 37-5 at 2. Defendant Hand does

"not recall" speaking with Plaintiff's family, "nor is there any notation in

Mr. Rivera's medical chart that [he] spoke with his family." *Id.*

**Analysis**

The Eighth Amendment governs the conditions under which

convicted prisoners are confined and the treatment they receive while in

prison. <u>Farmer v. Brennan</u>, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed.

2d 811 (1994). The Eighth Amendment guarantees that prisoners will not

be "deprive[d] ... of the minimal civilized measure of life's necessities."

<u>Rhodes v. Chapman</u>, 452 U.S. 337, 347, 101 S. Ct. 2392, 2399, 69 L. Ed.

2d 59 (1981) (quoted in <u>Chandler v. Crosby</u>, 379 F.3d 1278, 1289 (11th

Cir. 2004)). "[B]asic human necessities include food, clothing, shelter,

sanitation, medical care, and personal safety." Harris v. Thigpen, 941 F.2d

1495, 1511 (11th Cir. 1991) (cited in Collins v. Homestead Corr. Inst., 452

F.App'x 848, 850-851 (11th Cir. 2011)).

Deliberate indifference to serious medical needs of prisoners violates

the Eighth Amendment's prohibition against cruel and unusual punishment.

Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).  "A

serious medical need is 'one that has been diagnosed by a physician as

mandating treatment or one that is so obvious that even a lay person would

easily recognize the necessity for a doctor's attention." Farrow v. West,

320 F.3d 1235, 1243 (11th Cir. 2003) (quotations omitted) (quoted in

Bingham v. Thomas, 654 F.3d 1171, 1176 (11th Cir. 2011)).  "In either of

these situations, the medical need must be 'one that, if left unattended,

'pos[es] a substantial risk of serious harm.'" Farrow, 320 F.3d at 1243

(citation omitted); *see also* Mann v. Taser Intern., Inc., 588 F.3d 1291,

1307 (11th Cir. 2009).  Alternatively, "a serious medical need is determined

by whether a delay in treating the need worsens the condition" or "if left

unattended, poses a substantial risk of serious harm." Mann v. Taser

Intern., Inc., 588 F.3d 1291, 1307 (11th Cir. 2009) (citations omitted).

Deliberate indifference requires more than negligence,[6] but it is unnecessary to show a defendant intended to cause harm.  Farmer v. Brennan, 511 U.S. 825, 835, 114 S. Ct. 1970, 1978, 128 L. Ed. 2d 811 (1994).  Deliberate indifference requires a plaintiff to show that a defendant was subjectively reckless and consciously disregarded a substantial risk of serious harm.  Wilson v. Seiter, 501 U.S. 294, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991) (explained in Farmer, 511 U.S. at 838-40, 114 S. Ct. at 1979-80).  "The inadvertent or negligent failure to provide adequate medical care 'cannot be said to constitute 'an unnecessary and wanton infliction of pain.'"  Estelle, 429 U.S. at 105-06, 97 S.Ct. 285 (quoted in Farrow, 320 F.3d at 1243).

In a claim for the denial of medical care, a plaintiff must show: "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need, and an actual inference of required action from those facts."  Taylor v. Adams, 221 F.3d 1254 (11th Cir. 2000), cert. denied, 531 U.S. 1077 (2001); Farrow, 320 F.3d at 1243.

---

[6] "Conduct that is more than mere negligence includes: (1) grossly inadequate care; (2) a decision to take an easier but less efficacious course of treatment; and (3) medical care that is so cursory as to amount to no treatment at all."  Bingham, 654 F.3d at 1176 (citing Brown v. Johnson, 387 F.3d 1344, 1451 (11th Cir. 2004)).

Put another way, to show a defendant acted with deliberate indifference, "a prisoner must show the prison official's: '(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence.'" Bingham, 654 F.3d at 1176 (quoting Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004) (citing McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999)).

"However, not 'every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment.' " McElligott v. Foley, 182 F.3d 1248, 1254 (11th Cir. 1999) (citation omitted) (quoted in Farrow, 320 F.3d at 1243).  For example, medical malpractice does not constitute deliberate indifference.  Estelle, 429 U.S. at 106, 97 S. Ct. at 292.  "Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment."  Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991) (citing Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir. 1989)).  "A 'complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.'" Estelle, 429 U.S. at 106, 97 S.Ct. at 292 (quoted in Bingham, 654 F.3d at

1176).  For example, the prisoner in <u>Estelle</u> received treatment for his back

injury, but complained that more should have been done in the way of

diagnosis.  The Court rejected this as a basis for liability:

> But the question whether an X-ray--or additional diagnostic
> techniques or forms of treatment--is indicated is a classic
> example of a matter for medical judgment.  A medical decision
> not to order an X-ray, or like measures, does not represent
> cruel and unusual punishment.

429 U.S. at 107, 97 S. Ct. at 293.  Put simply, an "official acts with

deliberate indifference when he or she knows that an inmate is in serious

need of medical care, but he fails or refuses to obtain medical treatment for

the inmate."  <u>McElligott</u>, 182 F.3d at 1255 (citations omitted).

At the outset, it is accepted that Plaintiff has demonstrated that he

had a "serious medical need."  Defendants wisely do not contest that issue.

Instead, Defendants assert that there is no evidence that Defendants were

deliberately indifferent to Plaintiff's need.  ECF No. 37; *see also* ECF No.

42 at 2.

Plaintiff had two serious medical needs - his spine and the fractured

ankle.  Plaintiff's evidence is that in December 2018 he "woke up" with

"excruciating pain."  He also experienced numbness and complained of

pain in his lower back.  Plaintiff did not complain of pain in his neck.  It is

concerning that it took nearly two weeks for Plaintiff to be seen by a nurse. However, there is no evidence that any named Defendant was responsible for that delay. Further, he was given pain medication and examined several times in January 2019. Different nurses evaluated Plaintiff and diagnosed him with a pinched nerve. Those nurses are not named Defendants and, moreover, a failure to properly diagnose a condition is not an Eighth Amendment violation.

On January 22, 2019, Plaintiff was examined by Defendant Acosta-Martinez. There is no evidence that this Defendant ignored or was otherwise deliberately indifferent to Plaintiff's condition. Defendant examined Plaintiff, ordered x-rays, and gave Plaintiff injections for pain, a prescription for Naproxen, and Defendant wanted Plaintiff scheduled for a follow-up appointment in a week. That did not happen, but it was not due to any fault or failure of Defendant Acosta-Martinez. Doctors do not handle the scheduling of patients. Defendant Acosta-Martinez had no further interaction with Plaintiff's medical care. In light thereof, summary judgment should be granted in favor of Defendant Acosta-Martinez.

Plaintiff's claim against Defendant Hand is also insufficient. Plaintiff has provided no evidence to show that the Defendant was involved in his

care or was deliberately indifferent to Plaintiff's need for care.  This Defendant does not actively treat patients.  There is no evidence that Defendant Hand was in charge of scheduling patients.  There is no evidence that Defendant Hand had any authority to intervene in Plaintiff's medical care, even if family members had complained to him.  Plaintiff has not supported his claim against Defendant Hand with any evidence of an Eighth Amendment violation.  Summary judgment should be granted in favor of Defendant Hand.

Plaintiff's claim against Defendant Kyer is that she failed to treat him and said he was "faking."  Defendant Kyer was the first medical person to examine Plaintiff after he fell on March 4, 2019.  Plaintiff said his "right leg gave out" and he reported it felt numb.  Plaintiff said the pain was worse in his back and right calf.  He said he could walk "a little," and was able to bend and straighten the joint.  There is nothing in that evidence that would have suggested to Defendant Kyer that Plaintiff had a broken ankle. Plaintiff has not provided evidence that he specifically informed Defendant Kyer of an ankle injury as opposed to his leg, back, and calf.  He did not specifically advise of ankle pain and there is no evidence that Plaintiff

reported to Defendant Kyer that he was experiencing the kind of pain associated with a fracture.

Further, the undisputed evidence is that Defendant Kyer saw Plaintiff walking, he had no swelling at that time, and he could bear weight on his right foot.  There was no bruising or discoloration.  The undisputed evidence reveals Defendant Kyer provided Plaintiff with a wheelchair and confirmed that Plaintiff had access to a handicap accessible shower and toilet.  She directed Plaintiff to return in the morning to be seen by the clinician, but Defendant Kyer had no further interaction with Plaintiff after examining him one time, on March 4, 2019.  Based on Plaintiff's symptoms at that time, it was reasonable for Defendant Kyer to take no further actions.  There is no evidence that Defendant Kyer was deliberately indifferent to Plaintiff's needs and summary judgment should be granted in her favor.

Plaintiff's claim against Defendant Houck remains.  Plaintiff first saw her on February 15, 2019, and she diagnosed Plaintiff with arthritis instead of a pinched nerve.  As noted above, a mis-diagnosis, if there was one, is not a constitutional violation.

On that occasion, Defendant Houck evaluated Plaintiff's gait and
noted he was avoiding bearing weight on his right leg.  She conducted a
"straight leg raise test ('SLR')" of Plaintiff's right leg and, because the
results were negative, determined Plaintiff did not have a spinal cord issue.
Defendant Houck reviewed the results of Plaintiff's lumbar spine x-ray from
January 2019 which showed only degenerative disc disease.  She
prescribed Plaintiff an anti-inflammatory (Mobic) and submitted a request
for physical therapy.  She was not deliberately indifferent to Plaintiff's
medical needs or symptoms.

Plaintiff was examined by Defendant Houck again on March 5, 2019.
She confirmed Plaintiff had "work restrictions," a low bunk pass, a
prescription for pain, and authorized a wheelchair pass and a wheelchair.
*Id.*  There is no evidence that Plaintiff informed her of ankle pain, had
bruising or swelling at that time, or otherwise presented symptoms of a
fractured ankle. Like Defendant Kyer, Defendant Houck saw no need to
order an x-ray.  That examination does not demonstrate that Defendant
Houck ignored Plaintiff's symptoms, refused to provide treatment, or was
deliberately indifferent to his medical needs.

Defendant Houck saw Plaintiff for a third time on March 13th after reviewing his chart.  At that point, she agreed that an x-ray needed to be taken of Plaintiff's right ankle.  While the Court finds that having Plaintiff wait until March 22nd for an x-ray was deficient and problematic, there is no evidence that Plaintiff was not treated for pain during that time period.  He was provided a wheelchair so that he would not further injure his ankle.  Moreover, there is no evidence that any Defendant was responsible for, or had any control over, the scheduling of x-rays.

After reviewing Plaintiff's x-rays, Defendant Houck took immediate action.  She requested that Plaintiff be evaluated by a surgeon, gave him pain medication, a splint, and informed him to put no weight on his right leg.  A day later Defendant Houck admitted Plaintiff to the infirmary and submitted an orthopedic surgery consult request.  Defendant Houck had no further interaction with Plaintiff after March 2019.  She was attentive to Plaintiff's needs, acted promptly when made aware of Plaintiff's injury, and provided treatment for pain.  Defendant Houck was not deliberately indifferent and summary judgment should be granted in her favor.

One additional point should be made.  Plaintiff pointed out in his summary judgment motion that he did not have surgery on his ankle for

"more than 8 months." ECF No. 39 at 2.  That delay is concerning, but is not attributable to the Defendants.  There has been no evidence submitted to show that any named Defendant in this case was responsible for the delay in Plaintiff receiving surgery for his fractured ankle.  Instead, delay was due to the informed decision of another medical provider that more serious needs should be treated first.  Because that delay is not due to the actions or inactions of any Defendant, Plaintiff has not demonstrated an Eighth Amendment claim.

## <u>RECOMMENDATION</u>

It is respectfully **RECOMMENDED** that Plaintiff's motion for summary judgment, ECF No. 39, be **DENIED**, Defendants' motion for summary judgment, ECF No. 37, be **GRANTED,** and judgment entered in Defendants' favor.

**IN CHAMBERS** at Tallahassee, Florida, on February 13, 2023.


 S/    Martin A. Fitzpatrick
**MARTIN A. FITZPATRICK**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations.  Fed. R. Civ. P. 72(b)(2).  A copy of the objections shall be served upon all other parties.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Fed. R. Civ. P. 72(b)(2).  _Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control._  If a party fails to object to the Magistrate Judge's findings or recommendations as to any particular claim or issue contained in this Report and Recommendation, that party waives the right to challenge on appeal the District Court's order based on the unobjected-to factual and legal conclusions.  _See_ 11th Cir. Rule 3-1; 28 U.S.C. § 636.**